# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WESTMORELAND COUNTY EMPLOYEE RETIREMENT SYSTEM, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>OVASCIENCE, INC., MICHELLE DIPP M.D., PH. D., JEFFREY E. YOUNG, RICHARD H. ALDRICH, JEFFREY D. CAPELLO, MARY FISHER, MARC KOZIN, STEPHEN KRAUSS, THOMAS MALLEY, HARALD F. STOCK, PH. D., J.P. MORGAN SECURITIES LLC, CREDIT SUISSE SECURITIES (USA) LLC, and LEERINK PARTNERS LLC,<br><br>Defendants. | Civil Action No. _____<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE SECURITIES ACT OF 1933

Plaintiff Westmoreland County Employee Retirement System ("Plaintiff" or "Westmoreland"), individually and on behalf of all others similarly situated, by and through Plaintiff's undersigned attorneys, allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings made by OvaScience, Inc. ("OvaScience" or the "Company"), conference call transcripts, scientific journals, analyst and media reports, and other commentary and analysis concerning OvaScience. Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants. Plaintiff believes

that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## SUMMARY OF THE ACTION

1.       Plaintiff brings this action under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against (1) OvaScience; (2) certain of OvaScience's senior executives and directors who signed the Registration Statement (as defined below) in connection with the Company's January 8, 2015 Secondary Offering (the "Offering"), and (3) each of the investment banks that acted as underwriters for the Offering.  In the Offering, the Company and the underwriters sold 2,300,000 shares of common stock at an offering price of $50.00 per share. The Underwriter Defendants (defined below) also had an option to purchase up to 345,000 additional shares.

2.       Defendant OvaScience is a life science company that engages in the discovery, development, and commercialization of new treatments for infertility.   The Company is attempting to develop various fertility treatment options purported to enhance egg health and revolutionize in vitro fertilization ("IVF").  The Company's Autologous Germline Mitochondrial Energy Transfer ("AUGMENT") treatment, designed to improve the energy and health of the woman's eggs by using mitochondria from a woman's egg precursor cells ("EggPCs"), is available in certain IVF clinics in select international regions.

3.       In violation of the Securities Act, Defendants negligently issued untrue statements of material facts and omitted to state material facts required to be stated from the Registration Statement, as amended, the January 6, 2015 Preliminary Prospectus Supplement, the January 8, 2015 Prospectus Supplement, and all documents incorporated therein (the "Offering Materials").

4.      Defendants are strictly liable for any and all material untrue statements or omissions in the Offering Materials.  Furthermore, because this case involves a Registration Statement, Defendants also had an independent, affirmative duty to provide adequate disclosures about adverse conditions, risks, and uncertainties.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii).  Thus, Defendants had an affirmative duty to ensure that the Registration Statement and the materials incorporated therein disclosed material trends and uncertainties that they knew, or should have reasonably expected, would have a materially adverse impact on OvaScience's business.  Defendants failed to fulfill this obligation.

5.      In particular, the Offering Materials contained misleading statements about and/or failed to disclose that:  (1) the very science behind AUGMENT was untested and in doubt; (2) the patients that had received OvaScience's AUGMENT procedure in 2014 did not achieve a pregnancy success rate that was significantly higher than the rate achieved without the Company's AUGMENT procedure; (3) the Company had not chosen to undertake its studies outside of the United States, but was forced to as it did not want to meet stringent and expensive federal regulations; and (4) the Company was far from being profitable, or even approaching profitability.  Accordingly, the price of the Company's shares was artificially and materially inflated in the Offering.

6.      Prior to the Offering and in the Offering Materials, the Company aired the alleged science behind the AUGMENT procedure which involved the transfer of mitochondria from EggPCs to the same woman's egg in a traditional IVF process.  This process and the existence of EggPCs was the creation of one of OvaScience's founders and was greatly hyped by the Company as being able to improve egg quality and enhance IVF.  The process served as the backbone of AUGMENT.

7.     In reality, though, that science had not fully been tested – and had not ever been tested on humans, so it was actually unknown whether it was effective or even safe.  The United States Food and Drug Administration ("FDA") had already pointed this out to Defendants, saying that the process was "not well supported," while a number of scientists and academics had been highly critical of the mitochondrial transfer process.  Indeed, the Company itself, in the patient application for AUGMENT, acknowledged that a similar process (mitochondria from donor eggs) had resulted in genetic mutations in offspring.

8.     Not only were investors misled about the science behind AUGMENT, they were also led to believe that it would increase IVF success rates.  This was done in Company filings and in a pre-Offering, December 17, 2014 "investor day" where Defendants touted the success rates of IVF with AUGMENT.  After the Offering, the Company continued this false optimism when, in March 2015, it announced results from two international studies (in Canada and in Turkey) of AUGMENT, and suggested they had found a 53% and a 25% success rate in IVF with AUGMENT.  Far from reacting positively to this news, though, the market saw the results as misguided and inaccurate.  In fact, when the actual number of women tested in each clinic (26 in Canada and 8 in Turkey) was compared to the number of ongoing pregnancies (7 in Canada and one in Turkey), the "success rate" was actually *below that for IVF*.  Additionally, the studies undertaken by OvaScience were actually entirely incapable of producing accurate success rates because they were faultily designed with too few subjects, no control arm, younger patients, and patients who underwent limited prior IVF procedures.

9.     Defendants also went to great lengths to explain away or even congratulate their "decision" to launch AUGMENT outside of the United States when, in reality, this choice was based solely on an attempt to avoid the costly regulatory procedures in the United States imposed

by the FDA.  The FDA had long informed Defendants that AUGMENT could not be excepted from the regulatory procedures and, rather than comply, Defendants engaged in "regulatory arbitrage" by launching studies abroad.  Despite their statements to the contrary, the very nature of AUGMENT dictates it is subject to FDA approval, as clearly evidenced by the lengthy paper trail between the FDA and OvaScience.

10.     Additionally, Defendants stated in the Offering Materials that they would enroll 1,000 AUGMENT patients in 2015 and that they would generate revenue in 2015.  The Company came nowhere close to this and, indeed, was only losing revenue and rapidly recording net losses.  All the while, though, certain Defendants profited handsomely as members of Longwood Fund, L.P. ("Longwood"), a venture capital investment fund that, prior to the Offering, owned almost 30% of OvaScience shares.  However, when the stock price was high prior to and around the Offering, Longwood managed to dispose of almost all of those shares, while enabling the Defendant members of Longwood to avoid filing with the SEC.

11.     Unfortunately for investors, the truth concerning the nature and extent of the problems facing the Company did not begin to emerge until the Offering was complete.  This downward spiral began on March 26 and 28, 2015, when the Company reported results of IVF clinics utilizing the AUGMENT procedure.  The "success" rates from those clinics were comparable to (or lower than) the success rate achieved for women using IVF without AUGMENT.

12.     Market participants highlighted the disappointing results associated with the AUGMENT treatment.  For example, on March 27, 2015, Leerink Partners LLC analysts Gena Wang, Ph.D., CFA and Howard Liang, Ph.D., stated that AUGMENT's "[o]verall pregnancy rate

appears less robust with a different denominator" and "the magnitude of AUGMENT benefit is unclear given no clear benchmarks and lack of standardized metrics."

13.     Following news of the AUGMENT results, shares of OvaScience fell from $48.29 to $31.15 per share over four days of trading, March 26 – April 1, 2015, *or over 35%*.

14.     Then, on April 6, 2015, the Southern Investigative Reporting Foundation ("SIRF") published an article that challenged the reported 53% clinical pregnancy rate observed from the Canadian clinic and countered that "26 women got the treatment [AUGMENT] and, of them, 7 were able to maintain a pregnancy for just under a 27 percent success rate."[1] Additionally, the SIRF article asserted that the AUGMENT procedure data presented did not achieve a significant success rate of clinical pregnancies compared to previous rates achieved without the Company's AUGMENT procedure (rates provided by the CDC).  On this news, the Company's shares fell from $35.06 on April 2 to $29.59 on April 7, *a drop of over 15%*.

15.     On June 17, 2015, an article published in the Boston Business Journal highlighted the deficient sample sizes of the Company's AUGMENT studies in Turkey and Canada.[2]  The article noted that the Turkish study was composed of only 8 women while the Canadian study was composed of 26 women.  From June 16, 2015 through June 29, 2015, the Company's stock price fell from $38.74 to just $27.77 per share.

16.     Then, on September 28, 2015, the Company issued a press release entitled "OvaScience Provides Update on Corporate Goal for AUGMENT Treatment" announcing "the Company does not expect to meet the 2015 goal of 1,000 AUGMENT treatment

---

[1]     Roddy Boyd, *Irreproducible Results*, SOUTHERN INVESTIGATIVE REPORTING FOUNDATION (Apr. 6, 2015), http://sirf-online.org/2015/04/06/irreproducible-results-inc/.

[2]     Don Seiffert, *Clinical data may not win over OvaScience skeptics – but revenue will*, BOSTON BUSINESS JOURNAL (Jun 17, 2015),  http://www.bizjournals.com/boston/blog/bioflash/2015/06/clinical-data-may-not-win-over-ovascience.html.

cycles." Previously, the Company guided for investors to expect 1,000 AUGMENT treatment cycles in 2015. On this news, the Company's shares fell from $16.47 on September 25, 2015[3] to $8.57 per share on September 29, 2015. In the midst of this free-fall, the Company announced that its CEO was being replaced.

17.     The stock has plummeted by over **97%** since OvaScience's Offering. As of the date this complaint was filed, the stock is trading below $1.50 per share.

18.     Defendants knew, or should have known, about the adverse problems, risks, conditions, and uncertainties concerning AUGMENT. It is reasonable to infer that Defendants knew about these problems well in advance of the Offering, yet they failed to adequately disclose them. Moreover, it is reasonable to infer that investors would not have purchased OvaScience shares in the Offering, or would have paid less for them, if they had been aware of the adverse problems, risks, and uncertainties plaguing the AUGMENT treatment, which had a significant negative impact on the price of OvaScience shares after these issues were belatedly disclosed to the public.

19.     In sum, unbeknownst to the investing public, Defendants sold the shares for an artificially inflated price in the Offering, and neither the Registration Statement nor the Offering Materials adequately disclosed material facts and adverse risks, conditions, and uncertainties that the Company and the other Defendants were either aware of, or should have been aware of, before and at the time of the Offering. As alleged herein, when the truth concerning the problems with AUGMENT was finally disclosed, such disclosures had a substantial negative impact on OvaScience's business and revenues, and thus on the value of the shares.

---

[3]     September 26 and 27, 2015 were a Saturday and Sunday, and thus, the markets were closed.

20.     This action therefore seeks recovery, including rescission, for innocent holders of OvaScience shares who suffered many millions of dollars in losses when the truth about OvaScience and its AUGMENT procedures finally emerged and the stock value plummeted.

21.     In violation of the Securities Act, Defendants negligently issued false and misleading statements and omitted material facts from the Offering Materials that the Company filed with the SEC in support of the Offering.   Defendants negligently allowed the Offering Materials to omit material facts regarding the Company's AUGMENT procedure to artificially promote the Company's stock price.   Defendants are strictly liable for any and all material misstatements or omissions in the Offering Materials.

22.     The Underwriter Defendants, defined below, shared an estimated $6.9 million in underwriting fees in connection with the Offering.   Net of these underwriting fees and before other expenses, OvaScience received approximately $108.1 million in proceeds from the Offering.

23.     For all of the claims stated herein, Plaintiff expressly excludes any allegation that could be construed as alleging fraud or intentional or reckless misconduct.   Plaintiff's claims are based solely on claims of strict liability under the Securities Act and are not based on and do not sound in fraud.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under §§11, 12(a)(2), and 15 of the 1933 Act.   *See* 15 U.S.C. §§77k, 77l(a)(2), and 77o.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §22 of the 1933 Act, 15 U.S.C. §77v.

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b).   OvaScience has operations, including its principal place of business, in this District and numerous events giving

rise to the violations complaint of herein, including the preparation and dissemination of materially inaccurate, false, and misleading statements (which were prepared by Defendants, or with their participation, acquiescence, encouragement, cooperation, and/or assistance) which occurred in whole or in substantial part in this District.

26.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## PARTIES

**Plaintiff**

27.     Plaintiff Westmoreland County Employee Retirement System, based in Greensburg, Pennsylvania, purchased shares of the Company's common stock directly in the Secondary Offering pursuant to the untrue and misleading Offering Materials and was damaged thereby.  Westmoreland purchased 500 shares in the Offering, on January 8, 2015, at $50.00 per share.

**Issuer Defendant**

28.     Defendant OvaScience is a global fertility company.  The Company is focused on the discovery, development, and commercialization of new fertility treatments based on egg precursor cells, or EggPCs, which are immature egg cells found in the protective outer layer of a woman's own ovaries.  The Company was formerly known as Ovastem, Inc. and changed its name to OvaScience, Inc. in May 2011.  OvaScience, Inc. was therefore founded in 2011 and is headquartered in Cambridge, Massachusetts.  Its shares are listed and traded on the NASDAQ under the ticker symbol "OVAS."

**Individual Defendants**

29.     Defendant Michelle Dipp M.D., Ph.D. ("Dipp") was, at all relevant times, the Chief Executive Officer ("CEO"), President, and a director of the Company.  Defendant Dipp signed or authorized the signing of the Registration Statement.  On January 6, 2016, the Company announced that effective July 1, 2016, Dipp would resign from her role as OvaScience CEO.  Dipp is also a partner of Longwood.

30.     Defendant Jeffrey E. Young ("Young") was, at all relevant times, Chief Financial Officer ("CFO") and Treasurer (Principal Financial Officer and Principal Accounting Officer). Defendant Young signed or authorized the signing of the Registration Statement.

31.     Defendant Richard H. Aldrich ("Aldrich") was, at all relevant times, a director of the Company.  Defendant Aldrich signed or authorized the signing of the Registration Statement. Aldrich is also a co-founder and partner of Longwood.

32.     Defendant Jeffrey D. Capello ("Capello") was, at all relevant times, a director of the Company.  Defendant Capello signed or authorized the signing of the Registration Statement.

33.     Defendant Mary Fisher ("Fisher") was, at all relevant times, a director of the Company.  Defendant Fisher signed or authorized the signing of the Registration Statement.

34.     Defendant Marc Kozin ("Kozin") was, at all relevant times, a director of the Company.  Defendant Kozin signed or authorized the signing of the Registration Statement.

35.     Defendant Stephen Kraus ("Kraus") was, at all relevant times, a director of the Company.  Defendant Kraus signed or authorized the signing of the Registration Statement.

36.     Defendant Thomas Malley ("Malley") was, at all relevant times, a director of the Company.  Defendant Malley signed or authorized the signing of the Registration Statement.

37.     Defendant Harald F. Stock, Ph.D. ("Stock") was, at all relevant times, a director of the Company.   Defendant Stock signed or authorized the signing of the Registration Statement.

38.     Defendants Dipp, Young, Aldrich, Capello, Fisher, Kozin, Kraus, Malley, and Stock are collectively referred to herein as the "Individual Defendants."

39.     The Individual Defendants each participated in the preparation of and signed (or authorized the signing of) the Registration Statement.  Defendant OvaScience and the Individual Defendants who signed (or authorized the signing of) the Registration Statement are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of OvaScience's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

**Underwriter Defendant**

40.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for the Offering.   J.P. Morgan acted as lead book-running manager of the Offering and as representative of the underwriters.

41.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter for the Offering.  Credit Suisse acted as a joint book-runner in the Offering.

42.     Defendant Leerink Partners LLC ("Leerink") was an underwriter for the Offering.

43.     Defendants J.P. Morgan, Credit Suisse, and Leerink are referred to collectively as the "Underwriter Defendants."   The Underwriter Defendants each served as a financial advisor

for and assisted in the preparation and dissemination of the Company's materially untrue and misleading Offering Materials.

44.     The Underwriter Defendants are primarily investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities.  As the underwriters of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a result of their participation in the Offering.

45.     In addition, the Underwriter Defendants met with potential investors and presented highly favorable but materially incorrect and/or materially misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

46.     Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the Offering.  They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation.   During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

47.     In addition to having unlimited access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (i) the strategy to best accomplish the Offering; (ii) the terms of the Offering, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Registration

Statement; (iv) what disclosures about the Company would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, at a minimum, the Underwriter Defendants were negligent in not knowing of the Company's undisclosed existing problems and plans and the materially untrue statements and omissions contained in the Offering Materials as detailed herein.

48.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the offer and sales of the Company's shares pursuant to the Offering and the Offering Materials, including to Plaintiff and the Class.

49.     Pursuant to the 1933 Act, the Underwriter Defendants are liable for the untrue and misleading statements in the Offering's Registration Statement, January 6, 2015 Preliminary Prospectus Supplement, and January 8, 2015 Prospectus Supplement and all documents incorporated therein. The Underwriter Defendants' negligent due diligence investigation was a substantial factor leading to the harm complained of herein.

## SUBSTANTIVE ALLEGATIONS

## I.     OVASCIENCE AND THE AUGMENT FERTILITY TREATMENT

50.     OvaScience is a life science company working on the development and commercialization of new fertility treatments. The Company bases its procedures on "egg precursor cells," or "EggPCs," which are found in the lining of the ovaries. The Company currently has three fertility treatments concerning EggPCs in development: AUGMENT, which aims to improve egg quality and increase the success of IVF; OvaPrime, designed to boost a

woman's egg reserve using her own EggPCs; and OvaTure, which seeks to create mature fertilizable eggs from a woman's own EggPCs without the need for hormone injections.

51.     As background, it is generally accepted that female mammals (including humans) are born with a fixed amount or supply of eggs.  As those eggs age, they lose energy.  Energy is stored in mitochondria, so the loss of energy relates to the decline in mitochondrial function.  One often used analogy is to that of a flashlight:  if an egg is seen as a flashlight and it has been sitting on the shelf for 38 years, it may still function, but will require new batteries (or mitochondria).

52.     Studies have been conducted using the mitochondria from younger donor eggs and inserting it into "older eggs."  However, this was not a permissible procedure because it involved three persons: the father (sperm), the mother (egg), and a donor (younger mitochondria).

53.     One of OvaScience's founders, Jonathan Tilly, Ph.D. ("Tilly"), was involved in the discovery of EggPCs and began to study whether the mitochondria from those EggPCs in the lining of the ovaries could be injected into eggs, thereby using the same woman's mitochondria and eggs.  This is the basis of the AUGMENT treatment whereby mitochondria are co-injected with the sperm during an IVF procedure.

54.     The AUGMENT process works as follows: a woman undergoes a surgical procedure to remove a small piece of her ovary from which the mitochondria from Egg PCs are extracted.  Then, in another procedure, mature eggs are removed from the same woman's ovaries and are injected with the previously withdrawn EggPC mitochondria, as well as with sperm.  The resulting embryo is then transferred back to the womb.

55.     Therefore, the procedure is a traditional IVF process with the addition of the first extraction surgery and the injection of the mitochondria with the sperm.

56.     The IVF market has grown dramatically over the past twenty years and is highly lucrative.  In 2012, IVF market revenue was approximately $9.3 billion, and that number is expected to grow up to $21.6 billion by 2020.[4]  Another analyst has projected that by 2022, the global IVF market will reach $27 billion.[5]

57.     As women opt to have children later and later in life, and as infertility rates continue to rise, the IVF market is only expected to continue to rapidly grow moving forward. Due to the personal and time-sensitive nature of the market, it can be described as frantic or reactive.

58.     Recognizing the lucrative market and the frantic needs of patients, the Company quickly began attempting to commercialize AUGMENT.  It began by launching trials in the United States.  In late 2012, OvaScience initiated a study of AUGMENT in the United States.  In the Company's February 25, 2013 annual report filed on Form 10-K with the SEC, OvaScience stated that it had "initiated commercial preparations for AUGMENT and, assuming the final results of the AUGMENT Study are positive, plan to begin generating revenues from AUGMENT in the second half of 2014. . . .  We do not believe we will be required to seek premarket approval or clearance of AUGMENT from regulatory authorities in the United States . . . ."

---

[4]     *World In Vitro Fertilization Market to Reach $21.6 Billion by 2020,* ALLIED MARKET RESEARCH (Jan. 2014), https://www.alliedmarketresearch.com/press-release/global-in-vitro-fertilization-market-to-reach-216-billion-by-2020.html

[5]     *IVF Market Size Projected to Reach USD 27 Billion by 2022: Grand View Research*, PR NEWSWIRE (May 3, 2016), http://www.prnewswire.com/news-releases/ivf-market-size-projected-to-reach-usd-27-billion-by-2022-grand-view-research-inc-577926061.html

59.     However, on September 10, 2013, in a press release entitled "OvaScience Provides Update on AUGMENT," filed on Form 8-K with the SEC, the Company announced that it "has chosen to suspend enrollment of AUGMENT in the U.S. while moving forward with its plans for enrollment outside of the U.S."   The Company previously had a number of communications with the FDA, who advised that the Company should file an Investigational New Drug ("IND") application.  The IND application would mean the trial would need to meet much more stringent and costly approval standards.  Instead of conforming to the more stringent and costly standards for approval, OvaScience took its IVF clinics outside of the U.S.

60.     In 2014, the Company launched a trial in Turkey at the Gen-art IVF clinic in Ankara, overseen by Kutlul Oktay, M.D., F.A.C.O.G., involving eight women who had previously failed three or more IVF cycles.  Of the eight, only two women reported a clinical pregnancy, although only one resulted in an ongoing pregnancy, meaning an actual success rate of just one in eight, or 12.5%.  The women in the Turkish trial ranged in age from 27 to 41.

61.     Also in 2014, OvaScience launched a clinic in Toronto, Canada involving 26 women who had previously failed one to three IVF cycles.  This clinic was overseen by Robert F. Casper, M.D., F.R.C.S.(C), Medical Director of TCART Fertility Partners of Toronto, Canada.  The average age of the pregnant women in the Canadian study was 33, which is very young for IVF.  Nine of the women in the study became pregnant with seven ongoing pregnancies, or a success rate of 26.9% (7/26).  OvaScience is likewise attempting studies at the Fakih IVF clinic in Dubai, United Arab Emirates.

## II.    OVASCIENCE OFFERS SHARES

62.     On November 10, 2014, OvaScience filed a Registration Statement on Form S-3 with the SEC for a proposed offering of shares of its common stock.

16

63.     On January 6, 2015, OvaScience filed a Preliminary Prospectus Supplement on Form 424B5 with the SEC, which preliminarily announced an $85 million Offering, but which did not set the Offering price.

64.     On January 8, 2015, the Company issued SEC Form 424B5, a Prospectus Supplement that announced the pricing of its Offering of 2,300,000 shares of common stock at an Offering price of $50.00 per share, for a total of $115 million.  Underwriter Defendants J.P Morgan and Credit Suisse acted as joint book-runners and Leerink acted as a co-manager for the Offering.

65.     In the Prospectus Supplement dated January 8, 2015, OvaScience incorporated, by reference, the following documents as part of its Offering materials: (1) the annual report on Form 10-K for the year ended December 31, 2013, filed on February 27, 2014; (2) portions of the Definitive Proxy Statement on Schedule 14A, filed on April 30, 2014; (3) quarterly reports on Form 10-Q, filed on May 8, 2014, August 7, 2014, and November 10, 2014; (4) current reports on Form 8-K, filed on January 9, 2014, January 13, 2014, January 13, 2014, February 7, 2014, March 6, 2014, March 18, 2014, June 19, 2014, September 18, 2014, December 11, 2014, December 17, 2014, December 24, 2014, and January 6, 2015; and (5) the description of the Company's common stock contained in the Registration Statement on Form 8-A, filed on April 25, 2013.  These materials, along with the Registration Statement, Preliminary Prospectus Supplement, and Prospectus Supplement, are collectively referred to herein as the "Offering Materials."

66.     On January 13, 2015, the Company announced the closing of the Offering, including the exercise in full by the underwriters of their option to purchase an additional 345,000 shares of common stock at the public offering price of $50.00 per share.  The exercise of

the underwriters' option brought the total number of shares of common stock sold by OvaScience to 2,645,000 shares and increased the total gross proceeds raised in the Offering to $132.3 million, before deducting the underwriting discounts, commissions, and estimated expenses.

67.     Although it is difficult to discern, Longwood (comprised of Defendants Dipp and Aldrich, as well as a third co-founder of OvaScience) profited handsomely surrounding the Offering – reducing their overall holdings drastically.

68.     The money raised in the Offering was allegedly to be used to fund: (1) the expanded international commercial launch of the AUGMENT treatment; (2) the anticipated 2015 launch of the OvaPrime treatment in select international IVF clinics outside of the United States; (3) the optimization of the OvaTure treatment and pursuit of a potentially accelerated development pathway; (4) the establishment of an international headquarters in the United Kingdom and additional international subsidiaries; and (5) working capital, capital expenditures, general research and development, and other general corporate purposes.

69.     Before the Offering, the Company did not have any revenue.  It did not announce any revenue until August 10, 2015, reporting for the second quarter of 2015, in which OvaScience recognized $30,000 in revenue.  As one analyst would note, "this is not a typo." Meanwhile, net losses have steadily risen – from $17.2 million from the first quarter of 2015 to $21.8 million for the first quarter of 2016.  Many of these net losses were, according to the Company, attributable to "non-cash based stock compensation," as well as the accounting for "Founders' stock."

### III.   THE COMPANY'S MATERIALLY UNTRUE AND INCOMPLETE OFFERING MATERIALS

70.     The Offering Materials omitted material information regarding: (1) the disputed science behind AUGMENT; (2) the poor results among women who participated in the AUGMENT fertility treatment, particularly, that the Company's AUGMENT procedure did not achieve a significant success rate of clinical pregnancies compared to previous rates achieved without the Company's AUGMENT procedure; (3) the truth behind the decision to launch and focus on AUGMENT internationally; and (4) the profitability of AUGMENT.

71.     Therefore, the Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation, including the Securities Act and Item 303.

### A.   False and Misleading Statements Concerning the Science Behind AUGMENT

72.     The Offering Materials repeatedly emphasize the technology and scientific procedure behind AUGMENT and tout the revolutionary discovery of EggPCs and mitochondrial transfer.

73.     For example, in the 2013 annual report filed on Form 10-K with the SEC (fully incorporated in the Registration Statement), the Company stated:

> Our patented technology is based on egg precursor cells ("EggPC[SM]"), which are found in the outer layer of a woman's own ovaries.  ***The recent discovery of EggPCs countered a long-held belief that women are born with a set number of eggs, thereby enabling new possibilities in the treatment of female infertility.***
> * * *
> By applying our EggPC technology platform in unique ways, ***we are developing new fertility treatment options that are designed to improve egg quality and in vitro fertilization*** ("IVF").

[Emphasis added.]

74.     These statements are likewise found in the Registration Statement, the January 6, 2015 Preliminary Prospectus Supplement, and the January 8, 2015 Prospectus Supplement, and in the Company's quarterly reports for 2014, filed on Form 10-Q with the SEC on May 8, 2014, August 7, 2014, and November 10, 2014.

75.     Meanwhile, many of the 2014 8-Ks (incorporated in the Registration Statement) contain the following similar statement:

> The Company's patented technology is based on the discovery of egg precursor cells (EggPC$^{SM}$), which are found in the ovaries.  By applying proprietary technology to identify and purify EggPCs, ***OvaScience is developing potential next generation in vitro fertilization (IVF) technologies***.

[Emphasis added.]

76.     The Registration Statement, the January 6, 2015 Preliminary Prospectus Supplement,  and the January 8, 2015 Prospectus Supplement all also state:

> By applying our EggPC technology platform in unique ways, we are developing and commercializing new fertility treatment options that are designed to improve egg health and in vitro fertilization, or IVF.

77.     The above statements concerning the technology, platform, and science behind AUGMENT were materially untrue and misleading and omitted material information because the Company failed to disclose that the EggPC mitochondria transfer was not sufficiently proven or tested to be able to support its use in fertility treatments such as AUGMENT.

78.     In fact, the mitochondria procedure had not been tested on humans and it was not known whether it was safe or efficacious.   Indeed, the patient application for AUGMENT acknowledges that a similar mitochondria transfer procedure ***had resulted in genetic mutations in offspring***.

79.     The FDA had long pointed this out to OvaScience.  In a September 2013 letter to the Company, the FDA noted a lack of support for the EggPC mitochondria process, saying it "is

not adequately designed to ensure the safety of the study subjects or the offspring" and that the protocol documents pertaining to the procedure contained statements regarding the very concept and its risks "that are not well supported."

80.     The Center for Human Reproduction ("CHR") published an article in 2015 (after the Offering) reminding that the mitochondrial transfer behind AUGMENT "remained unproven in humans" and was solely based on animal experiments.[6]

81.     The same article notes: "[a]s of this point, it is important to understand that **AUGMENT is only a hypothesis**, with no evidence to support that (i) improving mitochondrial content in older eggs really improves pregnancy chances; and (ii) that ovarian precursor cells used in the procedure really exist and/or contain appropriate mitochondria when 'ground up' and used in the procedure."[7] [Emphasis added.]

82.     The April 2015 SIRF article likewise highlighted the debate on whether the EggPC mitochondrial transfer theory was even viable and cited to failed studies in mice. It quoted one scientist as doubting the process behind AUGMENT and noting that "if there isn't proof of replicability for a claimed discovery or process, then the scientist has an obligation to note that, even though feelings are hurt."  Another quoted scientist stated that there was "very little support" for the "science" behind the AUGMENT procedure.

83.     Similarly, a March 2015 article in Science Magazine, entitled "Controversial fertility treatments focus on eggs' power plants," quoted a reproductive biologist as being "highly troubled" that OvaScience had "made the leap to human pregnancies" without animal

---

[6]     *AUGMENT[SM], a new experimental treatment for "older" eggs?*, CENTER FOR HUMAN REPRODUCTION (July 2015), https://www.centerforhumanreprod.com/fertility/chr-voice-july-2015/. ("CHR article").

[7]     *Id.*

studies and that no proper tests had been done to test "whether this approach can improve fertility—let alone whether it is safe for offspring . . . ."

84.     Therefore, in stating that the EggPC mitochondria transfer procedure behind AUGMENT enabled new possibilities and developments in the fertility market, Defendants failed to disclose that the process was questionable, challenged, unproven, and potentially dangerous.

**B.      False and Misleading Statements Concerning Success Rates**

85.     The Offering Materials discuss increasing birth rates and decreasing the number of IVF cycles required due to the use of AUGMENT.

86.     For example, the 2013 10-K clearly states: "We believe our EggPC technology could improve IVF by: ***Increasing live birth rates and reducing the number of IVF cycles.*** By improving egg quality, we believe we may be able to ***increase the percentage of IVC treatments which result in live births*** . . . ." [Emphasis added.].  This statement likewise appears in the Company's 10-Qs for 2014, filed on May 8, 2014, August 7, 2014, and November 10, 2014, in the Registration Statement, the January 6, 2015 Preliminary Prospectus Supplement, and the January 8, 2015 Prospectus Supplement.

87.     The 2013 Form 10-K likewise states that "[a]s part of AUGMENT, a woman's eggs may be rejuvenated by injecting mitochondria prepared from her own EggPCs into her egg during IVF. This has the potential to improve egg quality and thereby increase the success of IVF." This statement also appears in the May 8, 2014 10-Q and a nearly identical one appears in the August 7, 2014 10-Q.

88.     The November 10, 2014 10-Q, the January 6, 2015 Preliminary Prospectus Supplement, and the January 8, 2015 Prospectus Supplement all state that AUGMENT "has the

potential to improve egg health.   Improved egg health may offer the potential for better IVF success rates."

89.    The above statements concerning better success rates for IVF procedures using AUGMENT, rather than traditional IVF alone, were materially untrue and misleading and omitted material information because AUGMENT actually did not produce increased success rates for IVF and, in fact, the studies being undertaken by OvaScience to determine such a success rate were not even structured to be able to calculate that rate.

90.    On a March 27, 2015 conference call to discuss the results of two studies of AUGMENT (in Canada and Turkey), the Company stated that, at the Canadian clinic, there had been 26 patients who underwent the AUGMENT procedure.   Of those 26, 17 had embryo transfers and 11 became pregnant with nine ongoing pregnancies.   In Turkey, there were eight patients and all eight had embryo transfers.   Two of those patients became pregnant (25% success rate), but only one was an ongoing pregnancy (12.5%).   The Company touted the Canadian results as a 53% success rate (9/17), but as a March 27, 2015 Leerink report pointed out "different denominators suggest less robust benefit."   For example, in an HCW March 30, 2015 report, it was pointed out that including all IVF cycles as the denominator would result in 9/26 or a 35% success rate.   Indeed, the Society for Assisted Reproductive Technology (SART), which represents the majority of IVF clinics in the US, reports IVF pregnancy rates as a percentage of IVF cycles and not embryo transfers.

91.    Therefore, using the proper (and recognized) equation, the results reported revealed at best a 35% and a 25% success rate (30% average) with use of AUGMENT.   In fact, as pointed out in the SIRF article, only seven of the 26 women who got the AUGMENT treatment in Canada were able to maintain a pregnancy, for a 27% success rate.   When combined

with the one out of eight women who had an ongoing pregnancy using AUGMENT in Turkey (12.5% success rate), that makes an average success rate of under 20%.

92.     While the success rate for traditional IVF varies, it is typically estimated to be around 30%.[8]   The Company's own 2013 10-K states that "the percentage of women who ultimately achieved a live birth using ART plateaued at approximately 54% after four or more cycles " (10-K at 8) and that "of all the ART cycles performed, 29% resulted in live births . . . ."

93.     Thus, the "success rate" of AUGMENT (20-30%) was not better than, but equal to or *less than* the success rate for traditional IVF.   While the Company stated that AUGMENT would help older women who had tried traditional IVF treatments prior, the median age for the Canadian study was actually only 33 with an average of only two previous IVF treatment failures.

94.     As the 2015 CHR article later pointed out, the average age (33) and the average number of previously failed IVF attempts (two) were very low and that, for both, CHR used higher numbers.   CHR chided OvaScience for this manipulation, noting that: "If AUGMENT is meant as a treatment for 'older' ovaries, and women with truly poor prognosis, then the study of AUGMENT should, of course, primarily be conducted in older women with really poor prognosis, as evidenced by repeated failed IVF cycles and age in the 40s!"[9]   It therefore called the results reported from AUGMENT "anything but" excellent.

95.     An article published in "Science," dated April 3, 2015, echoed this conclusion, citing a fertility specialist at the Weill Cornell Medical College in New York City as stating the

---

[8]     *2013 Assisted Reproductive Technology, National Summary Report*, NATIONAL CENTER FOR CHRONIC DISEASE PREVENTION AND HEALTH PROMOTION, DIVISIONAL REPRODUCTIVE HEALTH, CENTER FOR DISEASE CONTROL (Oct. 2015), www.cdc.gov/art/pdf/2013-report/art_2013_national_summary_report.pdf at 7 (54,323 live birth deliveries divided by 190,773 total cycles = 28.5%).

[9]     CHR article, *supra*, note 6.

results were "not that impressive," as he had a number of patients who had failed two IVF cycles prior to treatment by him who then got pregnant.[10]

96.     In fact, the very design of the studies the Company was undertaking made it impossible to demonstrate any such publicized "success rates."  The study was extremely small (34 women total) and lacked a control group of those who would *not* receive the mitochondria, thereby running afoul of industry norms.  For example, the following chart outlines clinical studies of IVF populations in recent years and clearly shows the appropriate sample size and use of a control group:

| Date of Publication | Trial Title | Overview | Sample Size | Control Group |
|---|---|---|---|---|
| 5-9-14 | The effect of transcutaneous electrical acupoint stimulation on pregnancy rates in women undergoing in vitro fertilization: a study protocol for a randomized controlled trial. | A multicenter, randomized controlled trial to explore the effect of transcutaneous electrical acupoint stimulation (TEAS) on the clinical pregnancy rate (CPR) and live birth rate (LBR) compared with real acupuncture and controls in women undergoing IVF.  Involved women who had two or more previous unsuccessful ETs. | 2,220 | Yes. |
| 12-3-09 | A multi-centre randomised controlled study of pre-IVF outpatient hysteroscopy in women with recurrent IVF implantation failure. | A multi-centre randomised controlled trial to test the hypothesis that performing an outpatient hysteroscopy (OH) prior to starting an IVF cycle improves the live birth rate of the subsequent IVF cycle in women who have experienced two to four failed IVF cycles. | 758 | Yes. |
| 3-21-14 | The Impact of Maternal Body Mass | Goal of study to examine the effect of body mass index on | 752 | Yes. |

---

[10]     *See* Jennifer Couzin-Frenkel, *Eggs' power plants energize new IVF debate,* SCIENCE MAGAZINE, April 3, 2015.

| | Index on In Vitro Fertilization Outcomes. | gonadotropin dose requirements for ovarian stimulation, as well as other clinical outcomes in women undergoing IVF. | | |
|---|---|---|---|---|
| 7-24-15 | Clinical Outcomes of In Vitro Fertilization among Chinese Infertile Couples Treated for Syphilis Infection | To compare the clinical outcomes of infertile patients with and without syphilis after in vitro fertilization and embryo transfer (IVF-ET). The primary IVF outcomes were the clinical pregnancy rate and the birth of a healthy baby. | 320 couples | Yes. |

97.     In fact, one 2009 study, entitled "Neurological Condition of Infants Born After In Vitro Fertilization With Preimplantation Genetic Screeing (PGS)," looked at a study of children born to women randomly assigned to IVF with or without PGS.  The study size was 46 women (12 more than the OvaScience studies) and included a control group, but still concluded that the study was unable to reach a definitive conclusion due to the small sample size.[11]

98.     Without the absolutely basic metrics of an appropriate sample size and a control group, OvaScience could not possibly calculate the success rate of AUGMENT versus traditional IVF.  As concluded by the CHR in its July 2015 article:

> The sad news from all so far published data on AUGMENT[SM], therefore, is that *these data offer no information whatsoever* about what outcomes patients can expect from the procedure.  The even sadder news, however, is that, even with accumulation of many more patients*, the way this study is conducted, there is simply no way to determine the potential value of AUGMENT[SM]*.  Pronouncements of "improved pregnancy rates in women with very poor prognoses" by the company, therefore, at least as of this point have to be considered as groundless and misleading.[12]

---

[11]     Karin J. Middelburg, et. al., *Neurological Condition of Infants Born After In VitroFertilization With Preimplantation Genetic Screening*, PEDIATRIC RESEARCH (2010) 67, 430–434, *available at* http://www.nature.com/pr/journal/v67/n4/full/pr201078a.html (accessed June 17, 2016).

[12]     *See* CHR Article, *supra*, note 6.

[Emphasis added.]

99.     The fallacy of the 2014 studies and their inability to show any sort of "success rates" has tacitly been admitted to by OvaScience.  On February 25, 2016, the Company announced its year-end 2015 results and announced that it would be working with one of the largest IVF clinics to enroll patients in a "controlled, double-blind, prospective and randomized egg allocation study of the AUGMENT treatment" and that this study was "designed to evaluate the success rates of standard IVF and the AUGMENT treatment."

100.     Therefore, the statements in the Offering Materials regarding AUGMENT's success rates were misleading and the Offering Materials omitted material information regarding these purported success rates.

### C.     False and Misleading Statements Regarding International Operations

101.     The Offering Materials emphasized that the Company's AUGMENT treatment had been launched in select international clinics as early as 2014 and go to great length to extol the international component of AUGMENT, including that "we have always had a strategy to make our fertility treatments available to patients worldwide."  *See, e.g.*, February 27, 2014 10-K; May 8, 2014 10-Q; August 7, 2014 10-Q; November 10, 2014 10-Q; January 6, 2015 Preliminary Prospectus Supplement.  And further, "[t]he AUGMENT treatment is not available in the United States."  *See, e.g.*, November 10, 2014 10-Q; December 17, 2014 8-K.

102.     Only after discussing the alleged benefits to international development do the Offering Materials discuss the fact that the FDA had required further regulatory processes in order for AUGMENT to be offered in the United States, concluding that "[w]e anticipate having further discussions in 2014 with the FDA to present details on AUGMENT and to determine the appropriate path forward."  *See* February 27, 2014 Form 10-K at 2.

103.    Furthermore, in the "risk" disclosures in the 2014 10-K, the Company writes that "[w]e believe that AUGMENT meets the regulatory definition of a 361 HCT/P. ***AUGMENT involves mere isolation of mitochondria from egg precursor cells***, and injection of those mitochondria into the same woman's egg, which we believe constitutes minimal manipulation of both the mitochondria and the egg."  [Emphasis added.].  The same Form 10-K also provides: "[w]e continue to believe that AUGMENT qualifies as a 361 HCT/P."

104.    The above statements were materially untrue and misleading and omitted material information because the Company failed to disclose that the reason AUGMENT was being used abroad was because the Company sought to avoid the steps and costs of an IND application to the FDA and there was simply no basis to believe that AUGMENT qualified as a 361 HCT/P. Indeed, the choice to make AUGMENT commercially available outside of the United States was referred to by H.C. Wainwright & Co. in a March 18, 2015 report as "a clever display of regulatory arbitrage . . . ."

105.    The Company was informed that it was required to submit an IND application to the FDA in order to use AUGMENT in the United States.  OvaScience chose to avoid this process and set up AUGMENT centers outside of the country, as the IND process is costly and time consuming.  The IND stage alone can take anywhere from six to 11 years and could cost tens or even hundreds of millions of dollars.[13]  Rather than inform investors of these evasive tactics, Defendants touted the alleged benefits of international centers.

106.    Furthermore, there was no basis for the statements that AUGMENT qualified as a 361 HCT/P.  Section 361 of the Public Health Service Act allows some human cellular and tissue

---

[13]    *See, e.g.*, *The Drug Development and Approval Process*, FDAREVIEW.ORG, http://www.fdareview.org/03_drug_development.php (last visited June 17, 2016); *see also Investigational New Drug (IND)*, INVESTOPEDIA, http://www.investopedia.com/terms/i/ investigational-new-drug-ind.asp (last visited June 17, 2016).

based products to be tested and marketed without FDA licensure.  These are often referred to as "361 HCT/Ps."  However, there is a list of criteria to classify as a 361 HCT/P, the main one being that the procedure or product involves "minimal manipulation."

107.    Since 2001, products involving transfers of genetic materials, like AUGMENT, have been subject to FDA regulation.  That year, the FDA sent a letter to those companies performing mitochondria transfer procedures and stated that "[t]he use of such genetically manipulated cells (and/or their derivatives) in humans constitutes a clinical investigation and requires submission of an Investigational New Drug application (IND) to FDA."[14] "[M]itochondrial genetic material" was explicitly included as an example of the genetic cells covered.  In fact, no human trials of any such products have been allowed without submission of an IND.

108.    In 2013, the FDA raised the same concerns about AUGMENT directly to OvaScience stating that it did not meet the criteria for regulation as a 361 HCT/P.  On April 9, 2013, the FDA sent OvaScience a letter confirming that "the removal of mitochondria and introduction in other reproductive tissue appears to be more than minimal manipulation," thereby failing to meet the first requirement for classification as a 361 HCT/P.  The letter further dictated that AUGMENT "may raise additional regulatory concerns" and that OvaScience should contact the FDA "[f]or more information about applicable regulations or to schedule a pre-IND meeting."

109.    The FDA sent Defendants yet another letter on September 6, 2013, citing violations and recommending corrections.  That letter was clear that "[t]he removal of

---

[14]    Kathryn C. Zoon, *Letter to Sponsors/Researchers – Human Cells Used in Therapy Involving the Transfer of Genetic Material By Means Other Than the Union of Gamete Nuclei*, FDA.GOV (July 6, 2001), http://www.fda.gov/BiologicsBloodVaccines/SafetyAvailability/ ucm105852.htm (last visited June 17, 2016).

mitochondria and the subsequent introduction of these organelles into other reproductive tissues appear to be more than minimal manipulation" and therefore "does not meet all the criteria in 21 CFR 1271.10 for regulation solely under section 361 of the Public Health Service Act." It concluded by stating "it appears you are treating subjects under your clinical study protocol, even though you have not submitted an IND.  We are taking this opportunity to advise you that ***an IND is required for this study***." [Emphasis added.]

110.    Therefore, at the time of the Offering, no doubt was left that AUGMENT, by its very nature (the transfer of genetic material), did not qualify as a 361 HCT/P.

### D.    Profitability Statements

111.    The Offering Materials led investors to believe that the Company would be profitable imminently.  For example, the January 6, 2015 Preliminary Prospectus Supplement, January 8, 2015 Form 8-K press release, and January 8, 2015 Prospectus Supplement all state that "[i]n 2015, we expect at least 1,000 additional patients to be receiving the AUGMENT treatment."

112.    On May 8, 2014, Defendants announced their first quarter of 2014 results and stated that they were confident they could "generate initial revenue by year end."  *See* May 8, 2014 press release on Form 8-K.

113.    Similarly, in the Form 10-Q for the third quarter of 2014 (filed November 10, 2014), Defendants averred:

> We expect to transition these ACE clinics to commercial centers by the end of 2014, ***generating initial revenue***, and to expand the treatment's availability in additional IVF clinics in select international regions ***in 2015***.

[Emphasis added.]

114.    Following these statements in the Offering Materials, Defendants consistently repeated this 1,000 AUGMENT patients figure and that "significant AUGMENT revenue" would be recognized in 2015.

115.    Indeed, a March 18, 2015 Oppenheimer analyst report stated that "[w]e confirmed with management that guidance remains on track and the company is confident in meeting the goal [of 1,000 Augment cycles in 2015]."

116.    The above statements concerning revenue and profitability were materially untrue and misleading and omitted material information because OvaScience was nowhere near recognizing revenue, but was continually recording net losses due, in large part, to insider payments.  Furthermore, the faulty process behind AUGMENT and the dubious trials being conducted that did not result in any heightened success rate ensured that 1,000 patients would not be enrolled to try AUGMENT in 2015.

117.    In repeated quarterly and year end filings made by Defendants after the Offering, the Company recorded increased and large net losses, due often, in part, to "stock-based compensation" and accounting for "Founders' stock."  *See, e.g.*, March 16, 2015 Form 8-K (net losses of $18.9 million in fourth quarter of 2014 that included "non-cash stock-based compensation expense of $6.4 million due in large part to accounting of certain Founders' stock"); August 10, 2015 Form 8-K (net losses of $17.5 million that included "non-cash stock-based compensation expense of $4.4 million").  Such expenses and accounting made it difficult to avoid net losses and to recognize revenue.  Not surprisingly, therefore, on September 28, 2015, the Company announced it would miss this 1,000 cycle goal and ultimately only recorded any revenue from *14 patients in the fourth quarter of 2015*.  *See* September 29, 2015 Form 8-K; February 25, 2016 Form 8-K.

118.    The history of the Company reveals a propensity towards awarding insiders at the expense of investors.  Defendants Dipp and Aldrich, along with non-party Christoph Westphal, OvaScience's other co-founder, are partners of Longwood, a venture capital firm that acquired its interest in OvaScience through a series of initial investments and private placements.

119.    As of February 8, 2013, according to its Form 13D filing with the SEC, Longwood owned approximately 28.2% of all shares of OvaScience.

120.    In the approach to the January 2015 Offering, however, Longwood began unloading its OvaScience shares.  Then just three days after the Offering, Longwood filed another Form 13D in which it announced it had sold shares and reduced its ownership interest to 10.7% of all OvaScience shares.

121.    While the stock price remained artificially inflated by the misstatements and omissions identified herein, Longwood continued to liquidate its OvaScience holdings, and by March 20, 2015 – just days before the truth about the Company began to be revealed – Longwood had reduced its total holdings to only 6.5% of all OvaScience shares.

122.    Furthermore, by hiding behind Longwood, Defendants Dipp and Aldrich were able to reap tremendous profits via the Offering, without having to disclose their own personal transactions in the Company.  Indeed, Aldrich did not file any Form 4s with the SEC between September 19, 2014 and January 16, 2015.

## IV.    DEFENDANTS VIOLATED ITEM 303

123.    The SEC created specific rules governing the content of disclosures made by public companies in their filings with the SEC that are incorporated by reference in connection with a public offering of stock.  Item 303(A)(3)(II) of Regulation S-K ("Item 303") provides guidance on what should be included in incorporated forms.

124.   Item 303 requires a registrant to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. §229.303(a)(3)(ii).   An omission of fact required to be stated under Item 303 renders the registrant liable under §11.

125.   Here, known trends existed at the time of the misleading statements and omissions identified herein, and thus, the Offering Materials failed to contain the disclosures required by Item 303.   At the time of the Offering, known uncertainties existed regarding whether the science behind AUGMENT was proven or safe and whether the Company's AUGMENT treatment would lead to statistically significant improvements over traditional IVF treatments.   Moreover, a known uncertainty existed with respect to whether the Company would achieve meaningful profits in the near term, and whether there would be any significant revenue in 2015 from AUGMENT.   Finally, a known uncertainty existed with respect to whether and how the Company would or could even attempt to obtain FDA approval for AUGMENT in the United States.

126.   Defendants had actual knowledge of these uncertainties before or at the time of the Offering.   Furthermore, given the close temporal proximity between the Offering and the post-Offering disclosures about the true nature of AUGMENT, it would be reasonable to infer that Defendants knew, or should have known with the exercise of due diligence, of these problems at the time of the Offering, but did not disclose them to the investing public. Moreover, it is reasonable to infer that shareholders would not have purchased shares in the Offering, or would have paid less for their shares, if they had been aware of the problems, risks,

outcomes, and uncertainties regarding AUGMENT, which had a significant negative impact on the price of OvaScience stock after they were belatedly disclosed to the public.

127.    Because of these uncertainties, as well as the other issues identified herein, the Company's financial results could be negatively impacted, and furthermore, OvaScience's Offering Materials were materially false, misleading, and/or incomplete at all relevant times.

128.    These uncertainties were reasonably likely to have material effects on OvaScience's financial condition and/or results of operation.  Because these uncertainties existed before or at the time of the Offering, pursuant to Item 303, Defendants were required to disclose this information in the Offering Materials, including in the Company's filings with the SEC incorporated by reference therein.  Since they did not, Defendants violated Regulation S-K, and accordingly, the 1933 Act.

## THE TRUTH BEGINS TO EMERGE

129.    Unfortunately for investors, however, it was not until almost three months after the Offering that the investors first began to learn the truth concerning AUGMENT.  When the results began to be disclosed in press releases on March 26, 2015 and March 28, 2015, the truth began to be revealed and the market responded.

130.    On March 26, 2015, the Company issued a press release entitled "OvaScience AUGMENT Fertility Treatment Shows Improved Pregnancy Rates in Women with Prior Failed IVF Cycles."  The Company stated that "[i]n 26 women who received the AUGMENT treatment, there were 9 clinical pregnancies out of 17 embryo transfers (53%)."  The press release stated the following, in pertinent part:

> Robert F. Casper, M.D., F.R.C.S.(C), Medical Director of TCART Fertility Partners of Toronto, Canada, a mitochondrial expert and one of the first IVF specialists to use the AUGMENT treatment in clinical practice, reported initial patient experiences in women whose ages ranged from 28 to 40 years and who

had one to three previous failed IVF cycles, often with poor embryo quality.  *In* *26 women who received the AUGMENT treatment, there were 9 clinical* *pregnancies out of 17 embryo transfers (53%).*

"*We are impressed with the pregnancy rates that we have seen with the* *AUGMENT treatment in women who tried IVF multiple times and never had a* *successful pregnancy*," said Dr. Casper.  "*We are encouraged by these results* *and believe the AUGMENT treatment may offer a much needed fertility* *treatment for women who are seeking new options*.  We look forward to continuing to report our clinical experiences in a wide range of patients who may benefit from the AUGMENT treatment."

The results reported in the poster presentation represent experiences from a small number of patients with different diagnoses, ages and prior IVF history.  *As of* *this reporting, pregnancy rates across IVF clinics that offer the AUGMENT* *treatment currently range from 25% - 53%, which includes clinics that are* *treating some of the more challenging infertility patients*.  OvaScience is collecting AUGMENT patient experience in a first-of-its-kind international registry, and anticipates sharing information from a broader patient experience when it is available.

[Emphasis added.]

131.   On March 27, 2015, according to Leerink analysts Gena Wang, Ph.D., CFA and Howard Liang, Ph.D., AUGMENT's "[o]verall pregnancy rate appears less robust with a different denominator" and "the magnitude of AUGMENT benefit is unclear given no clear benchmarks and lack of standardized metrics."

132.   On March 28, 2015, the Company issued a press release entitled "Additional Clinical Reports of OvaScience AUGMENT Fertility Treatment Show Improved Pregnancy Rates in Women with Multiple Prior Failed IVF Cycles."  The press release stated the following:

Kutluk Oktay, M.D., F.A.C.O.G, of Gen-art IVF in Ankara, Turkey, and one of the initial IVF specialists to use the AUGMENT treatment in clinical practice, presented initial clinical experience in eight women whose ages ranged between 27 and 41 years with three or more IVF failures and poor egg and embryo quality. In eight women who received the AUGMENT treatment, *there were two clinical* *pregnancies out of eight embryo transfers (25%).*  Most notably, the two pregnancies occurred with single embryo transfers in women aged 34 and 41 who

had previously failed to become pregnant following seven and three IVF cycles, respectively. One patient has an ongoing clinical pregnancy.

[Emphasis added.]

133.    On March 30, 2015, Andrew S. Fein, H.C. Wainwright & Co. analyst, questioned the Company's AUGMENT data pregnancy rate calculation stating that "the data raised interesting questions regarding: (1) the use of embryo transfer as the denominator in calculating success rates . . ." Fein further explained that an alternative representation of the data would result in a 35% success rather than the 53% success rate declared, and this method is utilized by SART.  Fein stated the following:

> Success rates for AUGMENT were presented as a fraction of the total number of embryo transfers, reporting a 53% pregnancy rate (9 pregnancies of 17 embryo transfers) for the Canadian site and 25% (2 pregnancies of 8 embryo transfers) at the site in Turkey. ***However, we note that an alternative representation of the data would have included all IVF cycles as the denominator (9 pregnancies from 26 cycles; 35% success rate)***.  Due to the nature of the technology (requiring additional manipulation of the oocyte at time of ICSI), the denominator could have reflected those patients that failed fertilization and failed to produce viable blastocysts.  ***This method is not without precedent: we note that The Society for Reproductive Technology (SART), which represents the majority of IVF clinics in the US, reports IVF pregnancy rates as a percentage of IVF cycles***, which are further delineated by fresh and frozen transfers.

[Emphasis added.]

134.    On this news, OvaScience shares fell from $48.29 to $31.15 per share over four days of trading, March 26 – April 1, ***or over 35%***.

135.    On April 6, 2015, SIRF published an article "Irreproducible Results, Inc."  The SIRF article challenged the reported 53% clinical pregnancy rate observed from the Canadian physician's data and countered that "26 women got the treatment [AUGMENT] and, of them, 7 were able to maintain a pregnancy for just under a 27 percent success rate."

136.   In addition, the SIRF article suggests that the AUGMENT procedure data presented did not achieve a significant success rate of clinical pregnancies compared to previous rates achieved without the Company's AUGMENT procedure (rates provided by the CDC).  The article stated the following, in pertinent part:

> . . . the Centers for Disease Control's archive of assisted reproductive technology statistics suggests at least a broad idea of what the press release's reported effects mean.
>
> The median age of the women receiving OvaScience's treatment in the Toronto clinic was 33 years old, with an average of two previous IVF treatment cycle failures.
>
> ***According to the CDC in 2012 – the most recent year available for data — of the women studied who were 35 and under who failed two prior IVF treatment cycles and received IVF with fresh non-donor eggs or embryos, 33 percent were expected to deliver a live birth***.

[Emphasis added.]

137.   The SIRF article likewise revealed the questionable science behind AUGMENT asking:  "So why does a company with 'Science' in its name apparently not want its own science put to the rigors of a formal scientific evaluation?"  It went on to note the dubious nature of Tilly's findings and how follow up studies to replicate his findings failed and then "took him to task for his conclusions."  For example, the SIRF article stated:

> Dr. Roger Gosden, a recently retired co-author on the 2006 Wagers-Eggan paper, said he stands by the research investigating Tilly's claims.
>
> 'Nothing I have seen—and very few labs are doing this work—suggests that these eggs are regenerating,' Gosden said.  'Even if [Tilly] was correct in some broad fashion, other labs surely would have [since] seized that research foundation and built on it.  That's not the case.'
>
> Gosden said the inevitable attention that Tilly's hypothesis generated in the business and media worlds raised a great deal of hope among women who were desperate to conceive.

*'If there isn't proof of replicability for a claimed discovery or process, then the scientist has an obligation to note that, even though feelings are hurt.'*

Another who disputes OvaScience's scientific premise is former Jackson Laboratory scientist John Eppig, who like Gosden is a recently retired veteran of decades of reproductive biology research.   'Within the reproductive biology community, ***there is very little support for what [Dr. Tilly] has asserted***,' he said. 'I suspect he misidentified [egg-]like cells that are not functionally reproductive.'

'There is also a broad question that needs to be answered from this work: Why do women go into menopause at all if there are these stem cells present?'

[Emphasis added.]

138.    As a result, the Company's shares fell from $35.06 per share on April 2, 2015 to $29.59 per share on April 7, 2015, a drop of over 15%.

139.    On June 17, 2015, an article published in the *Boston Business Journal* reinforced the deficient sample sizes of the Company's AUGMENT studies pending in Turkey and Canada.[15]   From June 16, 2015 through June 29, 2015, the stock price fell from $38.74 per share to just $27.77 per share.

140.    On August 10, 2015, OvaScience announced its financial results for the second quarter of 2015.   The Company announced just $30,000 in revenue, paired with net losses of $17.5 million, compared to net loss of $9.9 million year over year.   The stock, already in a nosedive, continued its free-fall, dropping below $19.00 per share before the end of August 2015.

141.    Then, on September 28, 2015, the Company issued a press release entitled "OvaScience Provides Update on Corporate Goal for AUGMENT Treatment" announcing "the Company does not expect to meet the 2015 goal of 1,000 AUGMENT treatment cycles."

---

[15]    Don Seiffert, *Clinical data may not win over OvaScience skeptics – but revenue will*, BOSTON BUSINESS JOURNAL ( Jun 17, 2015),  http://www.bizjournals.com/boston/blog/bioflash/2015/06/clinical-data-may-not-win-over-ovascience.html.

Previously, the Company was guiding for investors to expect 1,000 AUGMENT treatment cycles in 2015.

142.    On this news, the Company's shares fell from $16.47 per share on September 25, 2015 to $8.57 per share on September 29, 2015. [16]

143.    On November 5, 2015, OvaScience reported its financial results for the third quarter of 2015.  The Company reported a net loss of $17.9 million for the quarter, compared to a net loss of $12.9 million year over year.  On this news, the price of OvaScience common stock fell from $13.13 per share on November 5, 2015, to $9.87 per share on November 13, 2015.  During 2015, OvaScience's stock fell a total of 78.7%, leading one commentator to note "[n]eedless to say, this has been a horrific year for OvaScience."

144.    On January 6, 2016, the Company announced that Defendant Dipp would resign as CEO effective July 1, 2016, and that Defendant Stock would be her replacement.  On this news, the stock further fell from $9.24 per share on January 6, 2016 to $6.35 per share on January 13, 2016.

145.    On February 25, 2016, the Company announced its fourth quarter and full year financial results for 2015.  OvaScience announced net losses of $20.6 million (compared with a net loss of $18.9 million, year over year).  The stock price fell from $6.44 on February 24, 2016 to just $5.12 on February 26, 2016.

146.    Then on May 25, 2016, OvaScience announced that it was conducting a further public offering of common stock, intending to offer 7.15 million shares at $7.00 per share, while once again granting the underwriters of that offering, Defendant Leerink Partners LLC, a 30-day

---

[16]    September 26 and 27, 2015 were a Saturday and Sunday, and thus, the markets were closed.

option to purchase up to an additional 1,072,500 shares of common stock.  On this news, the stock price fell from $9.78 per share on May 25, 2016 to $6.93 per share on May 26, 2016.

147.    At the time of this filing, the stock is trading below $6.00 per share.  Therefore, since the time of the Offering, *the stock has dropped a cumulative 88%*.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

148.    Plaintiff bring this action as a class action on behalf of a Class consisting of all those who purchased the Company's common stock directly in the Company's Offering and who were damaged thereby (the "Class").  Excluded from the Class are Defendants; the officers and directors of the Company at all relevant times; members of their immediate families, and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

149.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class.  The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

150.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

151.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

152.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     whether Defendants violated the federal securities laws, as alleged herein;

b.     whether the Offering Materials contained materially false and misleading statements and omissions; and

c.     to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

153.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM
### Violations of §11 of the Securities Act
### Against All Defendants

154.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

155.     This Claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against each of the Defendants.

156.     The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

157.    The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially untrue statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

158.    The Individual Defendants each signed the Registration Statement.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, and to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the document contained all facts required to be stated therein.  In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

159.    The Underwriter Defendants each served as underwriters in connection with the Offering.  As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. These Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that they were true and accurate, that there were no omissions of material facts

that would make the Registration Statement misleading, and that the documents contained all facts required to be stated therein.   In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.   Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

160.    By reasons of the conduct herein alleged, each Defendant violated §11 of the Securities Act.

161.    Plaintiff acquired the Company's common stock pursuant to the Registration Statement, and without knowledge of the untruths and/or omissions alleged herein.   Plaintiff sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Registration Statement.

162.    This claim was originally brought within one year after the discovery of the untrue statements and omissions (in state court) and within three years of the date of the Offering.

163.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11 as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

## SECOND CLAIM
### Violations of §12(a)(2) of the Securities Act
### Against All Defendants

164.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

165.    Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the Offering.   Defendants issued, caused to be issued,

and signed the Registration Statement in connection with the Offering.   The Registration Statement was used to induce investors, such as Plaintiff and the other members of the Class, to purchase the Company's shares.

166.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.   Defendants' acts of solicitation included participating in the preparation of the materially untrue and incomplete Registration Statement.

167.    As set forth more specifically above, the Registration Statement contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

168.    Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement.

169.    The Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.   None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.   Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

170.    This claim was originally brought within one year after discovery of the untrue statements and omissions (in state court) and within three years after the Company's shares were sold to the Class in connection with the Offering.

### THIRD CLAIM
### For Violations of §15 of the Securities Act
### Against the Individual Defendants

171.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

172.    The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invest in, individually and collectively, had the power to influence, and exercised the same, over the Company to cause it to engage in the conduct complained of herein.

173.    By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiff and the other members of the Class compensatory damages;

C.    Awarding Plaintiff and the other members of the Class rescission on their §12(a)(2) claims;

D.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.      Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED:  November 22, 2017             **HUTCHINGS BARSAMIAN**
                                      **MANDELCORN, LLP**

                                       /s Theodore M. Hess-Mahan
                                      THEODORE M. HESS-MAHAN (BBO# 557109)
                                      110 Cedar Street, Suite 250
                                      Wellesley Hills, MA 02481
                                      Telephone:  781-431-2231
                                      Facsimile:   781-431-8726
                                      Email: thess-mahan@hutchingsbarsamian.com

                                      DAVID R. SCOTT
                                      AMANDA F. LAWRENCE (BBO# 568737)
                                      **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                      156 South Main Street
                                      P.O. Box 192
                                      Colchester, CT 06415
                                      Telephone: 860-537-5537
                                      Facsimile:  860-537-4432
                                      Email:   david.scott@scott-scott.com
                                               alawrence@scott-scott.com

                                      THOMAS L. LAUGHLIN IV
                                      DONALD A. BROGGI
                                      ANDREA FARAH
                                      **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
                                      230 Park Avenue, 17th Floor
                                      New York, NY 10169
                                      Telephone: 212-223-6444
                                      Facsimile:  212-223-6334
                                      Email:   tlaughlin@scott-scott.com
                                               dbroggi@scott-scott.com
                                               afarah@scott-scott.com

                                      *Attorneys for Plaintiff Westmoreland County*
                                      *Employee Retirement System*